IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELISSA A. GIACCHETTI,            )
                                  )
    Plaintiff,                    )
                                  )
v.                                )   No. 16 C 5055
                                  )
                                  )   Magistrate Judge Sidney I. Schenkier
NANCY A. BERRYHILL, Acting        )
Commissioner of Social Security,[1])
                                  )
    Defendant.                    )

### MEMORANDUM OPINION AND ORDER[2]

Plaintiff Melissa Giacchetti[3] has filed a motion seeking reversal and remand of the decision of the Acting Commissioner of Social Security ("Commissioner") denying her Social Security benefits (doc. # 9: Pl.'s Mot. for Summ. J.). The Commissioner has filed a response asking the Court to affirm its decision (doc. # 20: Def.'s Resp.). For the reasons that follow, we grant Ms. Giacchetti's motion.

### I.

Ms. Giacchetti applied for benefits on July 5, 2012, alleging she became disabled on March 1, 2010 (R. 9). After her claim was denied initially and upon reconsideration, she received a hearing before an Administrative Law Judge ("ALJ") on July 8, 2014 (*Id.*). On September 2, 2014, the ALJ issued a written opinion finding Ms. Giacchetti was not disabled from March 1, 2010 through the date of the decision (*Id.*). The Appeals Council upheld the ALJ's

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2]On June 16, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 6).

[3]Some documents erroneously state the claimant's name as "Mellisa" Giacchetti.

determination, making it the final opinion of the Commissioner (R. 1-3). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

Ms. Giacchetti was born on November 9, 1983. She enlisted in the Army in June 2002, eventually working as an intelligence analyst, until she was discharged from the service on March 18, 2010 (R. 45-47, 284-86). She has not worked since leaving the military (R. 47).

Ms. Giacchetti began receiving mental health treatment while with the military in 2006 (R. 412). In June 2006, she was diagnosed with irritable bowel syndrome secondary to anxiety attacks and a misconception that she smelled foul (R. 494). She began taking anti-anxiety medication and attending group counseling and individual psychotherapy (*Id.*). In July 2007, she was diagnosed with attention deficit disorder ("ADD") and prescribed Ritalin, and in August 2007, she was diagnosed with neurotic excoriation[4] secondary to trichotillomania[5] (*Id.*).

In April 2009, Ms. Giacchetti experienced suicidal ideation, "which necessitated an inpatient psychiatric stay" (R. 493). Ms. Giacchetti received treatment from Lonny R. Natter, M.D., and on May 4, 2009, he performed a fitness for duty mental health evaluation of Ms. Giacchetti. Dr. Natter found that she had "moderate impairment for further military duty" and failed Army retention standards due to depressive disorder and anxiety disorder (R. 409-11). Dr. Natter further stated that Ms. Giacchetti's prognosis was poor because she had longstanding symptoms that had not responded to treatment (R. 411).

---

[4]"Recurrent skin picking that results in skin lesions and causes clinically significant distress . . ." https://www.hopkinsguides.com/hopkins/view/Johns_Hopkins_Psychiatry_Guide/787063/all/Excoriation_Disorder (last visited Apr. 11, 2017).

[5]A mental disorder that "involves recurrent, irresistible urges to pull out hair from your scalp, eyebrows or other areas of your body." http://www.mayoclinic.org/diseases-conditions/trichotillomania/home/ovc-20268509 (last visited Apr. 11, 2017).

2

On August 5, 2009, a Medical Evaluation Board ("MEB") found Ms. Giacchetti failed to meet Army retention standards due to her mental health issues (R. 493, 501). The MEB stated that "in spite of going through the IOP (intensive outpatient program), using various modalities of treatment to include group therapy, cognitive-behavioral therapy, using 1:1 counseling, neuro-bio feedback and acupuncture," her mental impairments continued (R. 494). In addition, her anxiety spells had worsened; they were triggered by being in a classroom, smelling alcohol and feces, and hearing loud noises (R. 500).

On December 23, 2009, Ms. Giacchetti underwent a post-deployment screening, during which she reported experiencing nightmares and feeling watchful, numb, detached, depressed and hopeless (R. 477-78). She also reported having diarrhea, headaches, fatigue, forgetfulness, and joint pain that interfered with her daily activities (R. 478).

After she was medically discharged from the Army in March 2010, Ms. Giacchetti filed a claim for disability benefits with the U.S. Department of Veteran's Affairs ("VA") (R. 284).[6] On August 19, 2010, the VA found that Ms. Giacchetti's impairments were zero percent disabling, but Ms. Giacchetti contested that finding, and on August 16, 2011, the VA issued a new decision finding Ms. Giacchetti's mental impairments -- listed as post-traumatic stress disorder ("PTSD") with anxiety and depression -- were 70 percent disabling, effective March 19, 2010 (*Id.*).[7]

On October 27, 2011, Ms. Giacchetti was evaluated by psychiatrist, Jack Yen, M.D. (R. 744). Ms. Giacchetti reported that her panic attacks and anxiety had worsened, but she was not

---

[6]In determining benefits, the VA assigns disability ratings based on the "unemployability of the individual," or the ability to "secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). When a single disability renders a veteran 60 percent or more disabled, or multiple disabilities combine to render a veteran 70 percent or more disabled, total disability ratings may be assigned for purposes of compensation. *Id.*

[7]The August 2011 VA decision stated that the board had reviewed a rating decision from August 19, 2010, and VA medical reports April 2, 2010 and May 4, 2011 (which diagnosed Ms. Giacchetti with PTSD with anxiety, depressed mood and global assessment functioning ("GAF") score of 45) (R. 285). These underlying documents are not included in the record.

3

taking medications or engaging in psychotherapy at that time because she felt she was in a "good place" (R. 745-48). After a mental status examination, Dr. Yen diagnosed her with dysthymic disorder likely manifested as insomnia and anxiety, and he noted her previous diagnosis of PTSD (R. 748).[8]

On January 4, 2012, clinical psychologist, Karla Rennhofer, Ph.D.,[9] a specialist in trauma and PTSD (R. 970), completed a psychological assessment of Ms. Giacchetti in connection with her claim for VA disability benefits (R. 730). Ms. Giacchetti reported a history of childhood sexual and physical abuse and absenteeism and fighting in school, and she stated that she had trouble leaving the house, sleeping, and being near people for fear that she smelled (R. 732-35). Dr. Rennhofer observed her mood was anxious and dysphoric, but otherwise normal (R. 736). She opined that Ms. Giacchetti had PTSD and depression before the military, which remitted but then recurred after she experienced trauma on deployment to Kuwait in 2003 (*Id.*). Dr. Rennhofer diagnosed Ms. Giacchetti with PTSD, anxiety disorder, depressive disorder, parasomnia, impulse control disorder, trichotillomania and body dysmorphic disorder, and opined these conditions would "likely significantly affect[]" Ms. Giacchetti's ability to work or attend school (*Id.*).

Dr. Rennhofer treated Ms. Giacchetti beginning on May 21, 2012, seeing her weekly until at least August 23, 2012 (R. 970). On June 5, 2012, based on a rating decision of May 17, 2012, the VA further increased Ms. Giacchetti's disability rating, finding that her overall combined rating was 80 percent, entitling her to be paid full disability benefits effective March 19, 2010, because she was unemployable (R. 293). The VA letter noted that individuals with

---

[8] Dysthymic disorder is characterized by chronic low-level depression which has lasted for two years or more. https://www.nimh.nih.gov/health/statistics/prevalence/dysthymic-disorder-among-adults.shtml (last visited May 1, 2017).

[9] The ALJ's opinion incorrectly referred to Dr. Rennhofer as Karla Rennhaler.

4

total disability compensation should still apply for vocational rehabilitation benefits to help them try to obtain employment (R. 300).

On August 23, 2012, Dr. Rennhofer filled out a mental residual functional capacity ("RFC") form in connection with Ms. Giacchetti's application for Social Security benefits, opining that most of her mental impairments had worsened since January 2012 (R. 970). Dr. Rennhofer explained that Ms. Giacchetti's PTSD and her belief that she smelled bad made it hard for her to be around people or in stressful situations, and Ms. Giacchetti was "exhausted continuously" and would likely decompensate if she were exposed even to the stress of a routine work setting (R. 971). Dr. Rennhofer stated that Ms. Giacchetti had "significant problems with memory" that interfered with her concentration and ability to retain information and added to her anxiety and depression (R. 974-75). Ms. Giacchetti did not take medication for her mental impairments because it made her feel worse, and Dr. Rennhofer wrote that Ms. Giacchetti was not exaggerating her symptoms and "if anything she [wa]s likely to under report" her impairments (R. 971). Dr. Rennhofer opined that Ms. Giacchetti was markedly limited in all areas of understanding and memory and sustained concentration and persistence, and markedly limited in three of five areas of social interaction since March 1, 2010 (R. 972-73). Dr. Rennhofer concluded that Ms. Giacchetti was not able to work because "[h]er mental health problems coupled with her medical conditions ma[d]e it too difficult for her to do so" (R. 975).

On September 15, 2012, Matthew Galloucis, Ph.D., completed a psychological evaluation for DDS (R. 827). Ms. Giacchetti reported suffering from depression and anxiety for years, although she did fine in school and had no limitations in activities of daily living ("ADLs") (R. 828-29). Dr. Galloucis noted that Ms. Giacchetti's mood was anxious and her affect was variable in range and incongruent, as she spoke of traumatic events in her life in a "somewhat detached,

5

matter of fact, and incongruent manner" (R. 830). Dr. Galloucis found that Ms. Giacchetti's attention, concentration and memory were within normal limits (*Id.*).

On March 8, 2013, non-examining state agency psychologist, Russell Taylor, Ph.D., opined Ms. Giacchetti had mild restriction in ADLs, moderate difficulties in social functioning and maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration (R. 76-77). He found Ms. Giacchetti did not have understanding or memory limitations; was moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination with others, interact appropriately with the general public and respond appropriately to changes in the work setting; and was not significantly limited in her ability to carry out detailed instructions, sustain an ordinary routine, make simple work-related decisions, respond appropriately to supervisors and get along with coworkers (R. 79-80). Dr. Taylor noted that he gave great but not controlling weight to Dr. Rennhofer's August and October 2012 opinions because they were inconsistent with objective medical findings (R. 78). Dr. Taylor found that Ms. Giacchetti had "a fairly good response" to mental health treatment and "fairly normal daily routine and capabilities" (R. 80). In addition, he opined that despite her discharge from the Army, Ms. Giacchetti had "potential for significant residual capacity" so long as her RFC allowed for reduced interpersonal contact and routine and repetitive tasks (*Id.*).

Between February 27, 2014 and June 2, 2014, Ms. Giacchetti attended nine sessions of mental health therapy with Carol Starr Carpenter, MA, LPC (R. 1023-24). Ms. Carpenter wrote that Ms. Giacchetti "ha[d] made minimal progress toward her goals of decreasing her symptoms," but that her overall mental functioning could improve with consistent therapy (R. 1024). Ms. Carpenter opined that Dr. Rennhofer's opinions from 2012 were still valid (R. 1021).

6

**III.**

The ALJ held a hearing on July 8, 2014. Ms. Giacchetti testified that she had been treated for depression and anxiety since she was a teenager, but her mental health worsened after she was discharged from the Army and went through a divorce and miscarriage (R. 50). After her discharge, she took general education classes at a community college, but was unable to finish second semester because she had trouble concentrating and was uncomfortable being in a classroom with 20 other students (R. 38). She also tried to find a job but could not (R. 37). In 2013, Ms. Giacchetti found an apartment online and moved with a boyfriend to Colorado to be far from members of her family who were unhappy that she had filed a police report stating that her niece was being sexually abused (R. 35, 40, 45). Ms. Giacchetti lived by herself when her relationship with her boyfriend ended. She talked to her sister and friends, but she did not like her neighbors and did not like to be around other people (R. 36, 39, 50). After moving, she switched treaters, from Dr. Rennhofer in Illinois to Ms. Carpenter in Colorado (R. 48). Ms. Giacchetti testified that she suffered panic attacks, was hypervigilant, had trouble sleeping at night, and did not like to leave the house for more than brief periods of time (R. 49).

The ALJ presented the vocational expert ("VE") with a hypothetical individual who had no physical limitations, but had the following non-exertional limitations: could understand and remember simple instructions that could be learned and mastered within 30 days; could sustain concentration, persistence, and pace in a low-stress environment with only occasional and superficial social interaction with the general public and coworkers; could tolerate supervision and routine work; could plan and set simple goals; and could travel and recognize work hazards (R. 54). The VE testified that a significant number of jobs were available, even if the person

were further restricted to no interaction with the general public (R. 55). However, no jobs were available for someone who would be off-task more than 10 percent of the work day (R. 57).

## IV.

On September 2, 2014, the ALJ issued a written opinion finding Ms. Giacchetti was not disabled from March 1, 2010 through the date of the decision (R. 9). At Step 1, the ALJ found Ms. Giacchetti had not engaged in substantial gainful activity since March 1, 2010, the alleged onset date (R. 11). At Step 2, the ALJ listed Ms. Giacchetti's severe impairments as PTSD, mood disorder and personality disorder (*Id.*). She found Ms. Giacchetti's physical impairments were not severe, including ovarian cyst, back and neck pain, acne, gastroesophageal reflux disease, allergic rhinitis, history of pituitary tumor and history of alcohol abuse (*Id.*).

At Step 3, the ALJ determined that Ms. Giacchetti's impairments, individually or in combination, did not meet or medically equal Listings 12.04, 12.06 or 12.08 (R. 12). The ALJ determined Ms. Giacchetti had only mild restriction in ADLs, moderate difficulties in social functioning and concentration, persistence or pace, and no episodes of decompensation of extended duration (R. 12-13). The ALJ found Ms. Giacchetti had no trouble performing ADLs, and although she had some trouble getting along with people, she traveled often, including to Colorado and Thailand (*Id.*). In addition, although Ms. Giacchetti reported difficulties concentrating in a classroom, the ALJ stated that her ability to find an apartment on the internet and file a police report "shows logical thought content and that she is very goal oriented" (*Id.*). Further, the ALJ stated that there was no evidence of memory problems other than Ms. Giacchetti's subjective statements (R. 13). The ALJ determined that Ms. Giacchetti had an RFC to perform a full range of work at all exertional levels but was limited to: understanding and remembering simple instructions that could be learned and mastered within 30 days; a low stress

8

environment with only occasional and superficial social interaction with the general public and coworkers; routine work changes; and planning and setting simple goals (R. 14).

The ALJ found that Ms. Giacchetti's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible because of "numerous inconsistencies" in her reporting of "symptoms, onset, triggers, limitations and restrictions" including: (a) failing to report a history of mental illness and childhood abuse when she joined the Army; (b) reporting that she had participated in mental health treatment when she had actually refused medication and therapy; (c) not seeking mental health treatment from the time she was discharged from the Army until 2011; (d) reporting that she was molested as a child but also reporting that she had observed her stepfather molesting her sister; (e) reporting that she was a good student but also reporting that she had truancy and behavioral problems in school; and (f) stating that she could not be around others, even though she had participated in group therapy, attended college, traveled to Thailand, resided in an apartment with friends, drank socially, moved to Colorado with a boyfriend, looked for employment, and kept in close contact with some relatives by telephone (R. 14-15). The ALJ also found that Ms. Giacchetti's statements were inconsistent with objective medical evidence, including "grossly normal" psychiatric examinations (R. 15). In addition, the ALJ noted that although records stated that Ms. Giacchetti received multiple modalities of mental health treatment since May 2006, the record does not contain treatment records from before March 2009, and there was "a significant lapse in treatment" from December 2009 until June 2011 (R. 16-17).

The ALJ stated that Dr. Natter's May 2009 report diagnosing Ms. Giacchetti with PTSD, depression, anxiety and trichotillomania -- with only limited improvement since 2006 -- was "based on [Ms. Giacchetti's] self-reports," and was inconsistent with her "grossly normal"

9

mental status exam, her ability to answer questions politely and professionally, and her "good memory" for dates and times (R. 16). The ALJ found Ms. Giacchetti's report to Dr. Natter was internally inconsistent because she stated that she had long had mental health trouble but only recently remembered she was abused as a child (*Id.*).

The ALJ called the VA's August 16, 2011 decision to increase Ms. Giacchetti's mental health disability rating to 70 percent due to depression, anxiety and PTSD "incongruen[t]" and "counterintuitive" because she did not have mental health symptoms upon enlisting in the service (R. 18). The ALJ stated that the incongruence "provides insight into [the VA's] own reservations about their determinations and the lack of objective support found in the medical evidence of record" (*Id.*). The ALJ questioned the May 4, 2011 examination that the VA's decision relied on because it relied on a global assessment functioning ("GAF") score of 45 (indicating serious impairment in occupational and social functioning), but that GAF score was not found elsewhere in the record and was not supported by Ms. Giacchetti's treatment or functioning level (R. 17-18).[10] The ALJ further found the VA's referral of Ms. Giacchetti to "vocational rehab" was counterintuitive to its disability finding (R. 18). The ALJ also questioned the "guarded prognosis" offered by Dr. Yen in October 2011 because Ms. Giacchetti had refused antidepressants and therapy because she was in a "good place" (*Id.*).

The ALJ gave "very little weight" to Dr. Rennhofer's opinion that Ms. Giacchetti was markedly limited and unable to work because the ALJ found it was inconsistent with: (a) Ms. Giacchetti's ability to travel, search for a job, attend college, find an apartment on the internet,

---

[10]The ALJ also stated that GAF scores are "completely subjective, [and] vary widely from provider to provider," and thus "wholly unreliable" (R. 18). We note that the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed.2013). *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing the discontinuation of use of the GAF scale after 2012).

file a police report and drink socially; (b) "every other medical provider that has evaluated claimant's mental impairments," the "treatment records, contemporaneous treatment notes or objective findings;" and (c) Dr. Rennhofer's assignment of a GAF score of 55, which indicated only moderate limitations (R. 18-19). In addition, the ALJ stated that Dr. Rennhofer based her opinions "solely on the claimant's reports," which were unreliable and conflicting (*Id.*). The ALJ also questioned Dr. Rennhofer's opinion that Ms. Giacchetti became unable to work in March 2010 because they did not meet until January 2012, and the ALJ stated that Dr. Rennhofer's expertise was as "a clinical psychologist who specializes in trauma and PTSD and military fitness for duty assessments, but she does not have expertise in Social Security examinations" (*Id.*). The ALJ also gave Ms. Carpenter's opinions "little weight" because she was a "non-acceptable medical source" and simply "parrot[ed] the diagnoses set forth in Dr. Rennh[ofe]r's opinion statement" and "recited" Ms. Giacchetti's self-reported symptoms (R. 20-21).

The ALJ gave the VA determinations "no weight," calling them "relatively useless" because there was a "marked distinction" between finding a person fit for battle versus capable of substantial gainful employment (R. 23). In addition, the ALJ stated that the VA determinations were inconsistent with contemporaneous medical records, which did not document a severe worsening of Ms. Giacchetti's mental impairments but rather showed Ms. Giacchetti's psychological presentation was "normal" (R. 18-20). The ALJ also found the VA percent disability ratings were internally inconsistent because: they varied widely; the VA recommended that Ms. Giaccetti participate in vocational rehabilitation services even though they found her unemployable; and "the VA providers each arrived at differing conclusions about the onset of her symptoms, the effect on her diagnoses [] of her military service and the ultimate

11

severity of her symptoms and limitations" (*Id.*). The ALJ concluded that "while the claimant may not be deployable, she is employable" (R. 20).

The ALJ gave "great weight" to the state agency mental and physical examinations (by Drs. Galloucis and Aliaga, respectively), that showed essentially normal results, which the ALJ said was consistent with the medical record (R. 21). The ALJ gave "substantial weight" to the opinion of non-examining state agency psychologist, Dr. Taylor, and "adopted and incorporated his characterization" of Ms. Giacchetti's functional limitations into Ms. Giacchetti's RFC (R. 21-22). The ALJ also gave "substantial weight" to non-examining state agency physician, Dr. Free, who opined that Ms. Giacchetti did not have any severe physical impairments (R. 22-23). Ultimately, the ALJ determined that Ms. Giacchetti was unable to perform any past relevant work, but that jobs existed in significant numbers in the national economy that she could perform, and thus, she was not disabled (R. 23-24).

## V.

We review the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Plaintiff alleges several grounds for reversal and remand, including that the ALJ's decision to assign very little weight to Dr. Rennhofer's opinions was not supported by substantial

12

evidence (Pl.'s Mem. at 3-11). Because we find remand is appropriate on this ground, we need not address plaintiff's remaining arguments raised in support of remand.

The ALJ gave the opinions of Dr. Rennhofer, Ms. Giacchetti's treating psychologist, "very little weight" (R. 18-19). It is well-settled that "a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (internal citations and quotations omitted). "When controlling weight is not given, an ALJ must offer good reasons for doing so, after having considered: (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Id.*, citing 20 C.F.R. § 404.1527(c) and (d). The ALJ's analysis of the above factors in support of her decision to reject Dr. Rennhofer's opinions contains multiple errors that require remand. We highlight below three of them.

*First*, the ALJ erroneously trivialized Dr. Rennhofer's expertise as "a clinical psychologist who specializes in trauma and PTSD" because she did not have expertise in "Social Security examinations" (R. 19). While evidence from agency medical consultants is relevant because they are "highly qualified and experts in Social Security disability evaluation," 20 C.F.R. § 404.1513a(b)(1), expertise in Social Security evaluation is not what makes the opinion of a *treating physician* like Dr. Rennhofer probative. Rather, a treating physician's medical opinions should be given more weight where they are based on her "area of specialty." 20 C.F.R. § 404.1527(c)(5). Because Ms. Giacchetti's severe impairments included PTSD, mood disorder

13

and personality disorder, Dr. Rennhofer's expertise as "a clinical psychologist who specializes in trauma and PTSD" supports giving her opinions more, not less, weight.

*Second*, although the ALJ acknowledged that Dr. Rennhofer treated Ms. Giacchetti, the ALJ did not adequately consider the duration, thoroughness and frequency of her treatment and examinations. The ALJ dismissed Dr. Rennhofer's opinions on the ground that "[s]he base[d] her opinions solely on the claimant's reports" (R. 19).[11] However, Dr. Rennhofer's reports show that she not only recorded Ms. Giacchetti's complaints, but she also observed and examined Ms. Giacchetti over the course of months of treatment, ultimately opining that Ms. Giacchetti's mental impairments had worsened since January 2012, when Dr. Rennhofer first examined her. Dr. Rennhofer based that determination on regular visits with Ms. Giacchetti between May and August 2012, which "provide[d] a detailed, longitudinal picture" of Ms. Giacchetti's impairments, "a unique perspective . . . that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). *See also Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (an ALJ is "not permitted simply to discard" a treating physician's opinion, but must first "explicitly consider the details of the treatment relationship"). This consideration weighs in favor of giving a treater like Dr. Rennhofer more -- not less -- weight than the agency consultants who saw plaintiff once or not at all.

*Third*, the ALJ erred in determining that Dr. Rennhofer's "findings are at odds with every other medical provider that has evaluated the claimant's mental impairments and are not supported by the treatment records" (R. 19). This conclusion ignores contrary mental health

---

[11]The ALJ discounted Dr. Rennhofer's opinions on this ground because she determined that Ms. Giacchetti's reports of her symptoms and functional limitations were unreliable and inconsistent. Some statements the ALJ found to be inconsistent related to Ms. Giacchetti's recollections of childhood trauma and abuse and gaps in her recollection of these events. On remand, we recommend that the ALJ revisit this determination, and if the ALJ still finds these statements inconsistent, the ALJ should provide more explanation of the bases for this determination.

14

evidence which supports the findings in Dr. Rennhofer's reports, including Dr. Natter's treatment and evaluation in 2009 and Dr. Yen's examination in October 2011. The ALJ's error requires remand, because "[a]n ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser*, 838 F.3d at 912.[12]

In addition, the ALJ's determination that Dr. Rennhofer's opinions were inconsistent with the rest of the medical record ignores evidence of years of mental health treatment from the VA. Both the VA determinations of disability and Dr. Rennhofer's opinions found that Ms. Giacchetti was unemployable, in part because she received various modes of mental health treatment between 2006 and 2009, which were ultimately unsuccessful (*see, e.g.*, R. 735, 740, 970). Neither the ALJ nor the Social Security medical consultants had the opportunity to review this evidence, but the ALJ nevertheless gave more weight to the opinions of the agency consultants and questioned whether Dr. Rennhofer and the VA drew appropriate conclusions from this evidence.

The Seventh Circuit recently affirmed a district court's decision to grant the Commissioner's request for remand to allow the agency to reconsider the claimant's disability after expanding the administrative record to include the medical evidence that the VA had relied on. *Bird v. Berryhill*, 847 F.3d 911, 912-13 (7th Cir. 2017). On remand, we recommend the Commissioner follow the same path she followed in *Bird* and expand the administrative record to include the documents the VA decisions relied upon.[13]

---

[12]"This 'cherry-picking' is especially problematic where mental illness is at issue, for 'a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition.'" *Id.* (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)). On remand, the ALJ should consider this observation by the Seventh Circuit before automatically drawing an adverse credibility inference based on Ms. Giacchetti's occasional rejection of mental health medication or her assertion at one mental health visit that she was feeling fine.

[13]We are concerned that the ALJ called the VA disability determinations "relatively useless" on the assumption that there was a "marked distinction" between finding a person fit for battle versus capable of substantial

## CONCLUSION

For the reasons stated above, we grant Ms. Giacchetti's motion (doc. # 9). This case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

/s/ Sidney I. Schenkier
Sidney I. Schenkier
United States Magistrate Judge

Dated: May 2, 2017

---

gainful employment (R. 23). Although disability determinations by other governmental agencies do not bind the Commissioner, the Seventh Circuit has recognized that the VA's disability determination is "practically indistinguishable from the SSA's disability determination, which asks whether a medically determinable impairment prevents the claimant from engaging in past relevant work or any substantial gainful work that exists in the national economy." *Bird*, 847 F.3d at 912-13. *See also* 20 C.F.R. § 404.1504 (mandating that effective for claims filed on or after March 27, 2017, the Commissioner "will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim . . .").